**J.G., et. al., Plaintiffs,**

v.

**THE BOARD OF EDUCATION OF THE ROCHESTER CITY SCHOOL DISTRICT, et. al., Defendants.**

**No. 81–CV–173T.**

United States District Court, W.D. New York.

Jan. 14, 2002.

Ruth Scott, Scott Associates and Consultants, Inc., Rochester, NY, pro se.

Bryan D. Hetherington, Public Interest Law of Rochester, Rochester, NY, Jonathan Feldman, Public Interest Law Office of Rochester, Rochester, NY, for plaintiffs.

Donald T. Schmitt, Rochester City School Dist., Rochester, NY, for defendants.

## DECISION and ORDER

TELESCA, District Judge.

### INTRODUCTION

This class-action lawsuit was commenced in 1981 by parents on behalf of students in the Rochester City School District, (hereinafter the "City School District," "School District," or "District"), who are disabled, or who may be disabled, against the City School District. Plaintiffs allege that the defendants are violating State and federal laws and regulations, and the United States Constitution by failing to provide a free, appropriate public education to special education students in the Rochester City Schools. Specifically, plaintiffs contend that the School District has neglected current and potential special education students by, among other

things: failing to promptly evaluate those students for the presence of a disability; failing to promptly place special education students in appropriate programs; failing to provide appropriate special education programs; failing to establish goals for special education students or monitor progress towards those goals; failing to educate children in the least restrictive environment; failing to allow special education students to fully participate in extra curricular activities; failing to advise parents of their rights with respect to educating special education students, and failing to allow parental participation in the special education process.

The Complaint was filed in 1981, one year before I was appointed to the Federal Bench. In May, 1982, the case became my responsibility and several conferences were held with the parties. As a result of those meetings, the plaintiffs and School District entered into a Consent Decree on August 11, 1983. The Consent Decree was modified over the years, and in 1997, the parties entered into the latest version of the Consent Decree which provided that this Court would retain jurisdiction over the case for an additional three years, until May 1, 2000, when the decree would terminate. The Decree also provided that the School District would attempt to meet certain statistical goals as set forth in the Decree and the School District could petition this Court for "disengagement" from court oversight if it met its goals earlier than the May 1, 2000 expiration date of the Decree.

The Decree was entered on May 1, 1997. Thereafter, over the course of the next three and one-half years, the parties appeared before this Court on only one occasion, in April 1998, for a status report. Thereafter, in January, 2001, not having heard from the parties for over two and one-half years, and recognizing that the 1997 Decree had expired on May 1, 2000, I issued an Order to Show Cause why a formal order terminating the Decree and ending this case should not be entered. The School District responded to the Show Cause Order arguing that the Decree should be terminated on grounds that the District is now providing and will continue to provide satisfactory services to special education students. Plaintiffs argued that because the defendants are not in compliance with the 1997 Decree, or state and federal law, the Court should continue to exercise jurisdiction over this case.

Having considered the parties' arguments, and for the reasons sated below, I find that the 1997 Consent Decree has expired under its own terms and, therefore, the Decree is terminated, and the case is dismissed in its entirety with prejudice.

## BACKGROUND

### I. The Complaint

On March 6, 1981, plaintiffs filed a class-action Complaint against the Rochester City School District, the New York State Department of Education, and various defendants in their individual and official capacities. The main thrust of that Complaint was that the School District's provision of educational programs to special education students was woefully inadequate. Specifically, the plaintiffs contended that the School District was not in compliance with State and federal law with respect to evaluating students suspected of suffering from a disability.

The allegations in the Complaint fall into three broad categories. First, the plaintiffs complained that the School District did not evaluate students, or place them in special education programs, in a timely manner. Second, the plaintiffs alleged that students were not properly evaluated or placed into programs that would meet their needs. Finally, plaintiffs contended that students

and parents were not allowed to fully participate in the evaluation and placement process, and were not informed of their rights to participate in that process, or to object and/or appeal placement decisions or evaluations made by the District.

## II. *The 1983 Consent Decree*

After a number of conferences with the court during which the parties presented their various concerns, The parties agreed to enter into a consent order, which I approved on August 11, 1983. The overriding theme of the Consent Decree was that the Rochester City School District would improve the way it provided special education services to special needs students by: evaluating and placing students in programs in a more timely fashion; monitoring student progress; facilitating and encouraging parent and student participation in the evaluation and placement process; conducting more thorough evaluations; and creating individualized educational programs to ensure that special needs students would be placed in appropriate programs, (including private-placement programs), would not be unduly disrupted from their current programs, and would be provided an opportunity to participate in extracurricular programs. The Decree set forth in exacting detail the steps the District would be required to take in achieving these goals, and the consequences of non-compliance. Moreover, the Decree provided that the District would undergo a self-assessment to determine how well it was providing services to special needs students. The District also agreed to train teachers and staff to be more aware and responsive to the needs of disabled students, and to understand what their roles were in providing special services to students in compliance with State and federal law, and the Consent Decree.

In 1989, by agreement of the parties, the Decree was modified to reflect changes in state and federal regulations and their implementation in the process set forth in the Consent Decree.

## III. *The 1993 Enforcement Order*

Following modification of the Decree in 1989, plaintiffs became dissatisfied with the level of the School District's compliance and notified the District of several areas where non-compliance with the decree had increased substantially. Specifically, plaintiffs complained that the District was, *inter alia:* (1) failing to timely evaluate and place students in appropriate programs; (2) failing to monitor compliance with the 1983 Consent Decree; (3) failing to provide disabled students with equal access to all educational programs and extracurricular activities; (4) failing to educate disabled students in the least restrictive environment, and (5) improperly disciplining disabled students. The parties negotiated an Enforcement Order addressing these concerns, which was entered on October 15, 1993.

## IV. *The 1997 Consent Decree*

In 1996, three years after the 1993 Enforcement Order was issued, plaintiffs filed a motion for contempt on grounds that the District was not in compliance with both the 1983 Decree as modified, and the 1993 Enforcement Order. Plaintiffs complained that the defendants were not evaluating potentially disabled children in a timely fashion, and were not making timely placement recommendations. Joint Declaration of Elizabeth Schneider and Bryan Hetherington in support of Contempt Motion (hereinafter the "Schneider Declaration") at ¶¶ 46–50. Plaintiffs also contended that parents of special education students were misinformed as to educational options for their children, and were excluded from meetings and were not allowed to participate in decisions affecting their children's

placements in special education programs. Schneider Declaration at ¶¶ 51–53.

Rather than proceed with a contempt hearing, the parties negotiated a new Consent Decree, which was accepted by this Court on May 1, 1997. Unlike the previous consent decrees, the 1997 Decree set forth specific numeric goals that the District was to achieve in each of the following three school years. Whereas the previous Decrees sought to control *how* the District went about providing services to children with disabilities, the 1997 Decree focused on *results:* setting 16 specific standards in five broad categories that were of principal concern to the plaintiffs which were to be met by the District. The categories included: (1) timely recommendations by the Committee on Special Education and Committee on Preschool Special Education; (2) timely placement of students in appropriate programs once evaluations had occurred; (3) parental participation and satisfaction; (4) nondiscrimination and equal access; and (5) inclusion in mainstream curriculum and education in the least restrictive environment.

One notable and significant aspect of the 1997 Decree was that it provided a termination date after which the Court would no longer retain jurisdiction over the matter. Specifically, the Decree provides that: "[t]he court shall retain jurisdiction of this matter for *an additional three years from the date of the signing of the Consent Decree unless the Court determines, after a motion on notice to the parties, that the District has met the requirements for disengagement from court supervision . . . at an earlier date.*" 1997 Decree at p. 3, ¶ 6. (Emphasis mine.) Thus under the terms of Consent Decree, barring an extension of the Decree, the Court would retain jurisdiction over this matter for a maximum of three additional years, until May 1, 2000.

## V. *This Court's Order to Show Cause*

Not having heard anything from the parties as contemplated by the 1997 Decree, by Order dated January 30, 2001, I issued an Order to Show Cause why this case should not be dismissed with prejudice. A hearing was held on April 24, 2001, at which the plaintiffs appeared and argued that the Court should not dismiss the action because the District was not in compliance with the 1997 Decree or with State and federal regulations. The defendant School District urged this Court to dismiss the case arguing that the District was in substantial compliance with the 1997 Decree, and in any event, had implemented a plan for improving the provision of special education services to special needs students. I stayed determination of the Order to Show Cause until November, 2001, and ordered the School District in the interim to issue monthly reports to this Court concerning progress that the District had made, and was making, towards complying with the 1997 Consent Decree.

On November 27, the Court reconvened for further argument on the Order to Show Cause and the parties argued as follows.

### A. *The Defendant School District*

The School District filed two affidavits in response to the Order to Show Cause, one from Rochester School Superintendent Clifford Janey, and another from Dr. Marie Cianca, the Managing Director of the Education of Exceptional Children for the School District. Both affiants argued that despite the District's failure to meet a number of the standards set forth in the 1997 Consent Decree, it should nonetheless be terminated, and the case dismissed. Specifically, they contended that the Decree should be lifted because: (1) the School District complied with some of the criteria set forth in the 1997 Decree; (2) it

was "not reasonable or practicable" to attain "statistical perfection" with respect to accomplishing all the goals it agreed to undertake in 1997; (3) the District had paid the plaintiffs' attorneys $478,900.00 in attorneys fees since 1995, and that money could have been better spent on programs for students with disabilities; (4) the District had spent countless man-hours preparing reports and generating data for review by the plaintiffs' attorneys, costing the District an estimated $150,000.00 per year: money that could have been better spent on students; (5) the monitoring required under the 1997 Decree was unnecessary as the District was in substantial compliance with the Decree, and monitoring consumed resources that could have been better directed towards students; (6) the District was under the ever-increasing scrutiny of the State Education Department; (7) the District was in substantial compliance with the original 1983 Consent Decree; and (8) the District intended to introduce the "Rochester Plan" which would supplant the Consent Decree. That plan contained provisions for a "Focused Monitoring Team," which would oversee schools to ensure compliance with all regulations, specifically including regulations involving students with disabilities.

### B. The Plaintiffs' position

The plaintiffs argue that legal principles and equitable considerations prohibit termination of the Consent Decree at this time because the District is not in compliance, or even substantial compliance, with the terms of the 1997 Decree.

The plaintiffs offered three primary reasons why the Consent Decree should not be terminated:

1) The District has failed to meet the targets set forth in the 1997 Consent Decree.

2) The District is in "significant" violation of federal and state laws with regard to the education of students with disabilities, and if the Consent Decree is terminated, a new lawsuit, can and will be brought, wasting the time of the Court and counsel, and harming the beneficiaries of the Decree by delaying the District's compliance with the law.

3) The District's proposed self-monitoring plan, known as the Rochester Plan, is characterized as a "sham."

As stated above, the Consent Decree establishes sixteen (16) benchmarks that must be met by the District prior to termination of the Decree. According to plaintiffs, seven (7) of the sixteen (16) benchmarks address educational equity and nine (9) address procedural rights, such as the timely identification of students suspected of having disabilities. Plaintiffs claim that of the seven educational equity benchmarks, the District is "far from" compliance with any of the seven. With respect to the nine procedural rights benchmarks, plaintiffs claim that the District is not close to compliance with five of the goals, and argue that the District only "flirted" with compliance in the remaining areas. In sum, of the sixteen benchmarks, plaintiffs argue that the District has only achieved "substantial compliance" in one area—the timely mailing of placement letters.

Plaintiffs assert that defendants' argument that "times have changed" is an insufficient basis upon which to terminate the Decree. This argument, plaintiffs claim, fails because it does not take into account the fact that the Decree itself has changed since the 1980's. They note that the 1997 Decree was modified to include the target goals in exchange for excusing the District from complying with certain procedural requirements of the earlier Decree.

Plaintiffs also challenge defendants' argument that 100% compliance with the benchmarks is unfair. According to plaintiffs, 100% compliance is not strictly required. Rather, they would be satisfied if the District at least approached the 100% mark.

Plaintiffs also take issue with defendants "complaints" about the cost of compliance under the Decree.[1] Plaintiffs assert that because the District only provides, at best, a portion of the monitoring reports required by the Decree, there is no way that the costs of compliance are as burdensome as defendants claim. Further, plaintiffs argue, any money spent on compliance is a good investment for students with disabilities.

Finally, according to the plaintiffs, the proposed self-monitoring plan (known as the "Rochester Plan") "wholly lacks credibility." First, plaintiffs argue that the District's failure to comply with the reporting requirements of the Decree demonstrate that it will not effectively "self monitor." Further, plaintiffs argue, given the State Department of Education's deficiencies in looking out for the rights of disabled students, there is no reason to believe that it will provide meaningful oversight of the proposed plan.

For all of the foregoing reasons, plaintiffs argued that termination of the 1997 Consent Decree would be premature and inappropriate on both legal and equitable grounds.

## DISCUSSION

### I. *Legal Standards for Terminating a Consent Decree*

One principle that cannot be overstated in a 22 year-old case is that consent decrees which govern the provision of educational services to children in a statutorily and constitutionally acceptable manner "are not intended to operate in perpetuity." *Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 248, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). Where a court determines that a party to a consent decree is operating in compliance with the commands of the Constitution, and that it is unlikely that the party would revert to non-compliance, the court may terminate a consent decree. *Id.* at 247, 111 S.Ct. 630. As the Supreme Court stated in *Dowell:*

> The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by the local authorities. Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that "necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination."

*Dowell,* 498 U.S. 237, 248, 111 S.Ct. 630 (citing *Spangler v. Pasadena City Bd. of Education,* 611 F.2d, at 1245, n. 5 (Kennedy, J., concurring) (citation omitted)). The principles of *Dowell,* which involved racial segregation issues, are equally applicable in this case, where plaintiffs allege numerous statutory and constitutional deficiencies in the manner in which the School District educates its special needs students.

In determining whether or not to terminate a consent decree, a district court

---

1. Plaintiffs assert that the "vast majority" of the $478,900 the District claims to have spent on compliance since 1995 actually represents costs incurred in connection with attempts to secure compliance with the 1993 Enforcement Order and negotiating the 1997 Decree, not compliance monitoring under the 1997 Decree.

"should make sufficiently detailed findings of fact and conclusions of law under Rule 52(a), Fed.R.Civ.P., to advise the parties of the factual basis for its decision and permit informed appellate review." *Bradley v. Milliken,* 772 F.2d 266, 272 (6th Cir.1985). As the Supreme Court has noted, "[i]f ... a [consent] decree is to be terminated or dissolved, respondents ... are entitled to a [precise statement] from the court." *Dowell,* 498 U.S. at 246, 111 S.Ct. 630. Additionally, all objections raised by the party opposing termination must be dealt with by the District Court. *Youngblood v. Dalzell,* 925 F.2d 954, 961 (6th Cir.1991); *Gonzales v. Galvin,* 151 F.3d 526, 531 (6th Cir.1998). Nevertheless, a court need not await a party's motion to terminate a consent decree. *In re Birmingham Reverse Discrimination Employment Litigation,* 20 F.3d 1525, 1532 (11th Cir.1994). In accordance with *Bradley, Dowell,* and *Youngblood,* the following represents my findings of fact and conclusions of Law.

## II. *The 1997 Consent Decree has Expired under its own Terms.*

■ A consent decree is interpreted in accordance with principles of contract law. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). To determine the scope of a consent decree, courts must look to the four corners of the document, and should not rely on extrinsic evidence absent ambiguity in the language of the decree. *E.E.O.C. v. Local 40, International Assoc. of Bridge, Structural and Ornamental Iron Workers,* 76 F.3d 76, 80 (2nd Cir.1996) (citations omitted).

It is without question that consent decrees may expire under their own terms. *Balark v. City of Chicago,* 81 F.3d 658, 663 (7th Cir.1996); *E.E.O.C. v. Local 40,* 76 F.3d at 80. In the instant case, the 1997 Consent Decree provides that: "[t]he Court shall retain jurisdiction of this matter for an additional three years from the date of the signing of the Consent Decree unless the Court determines, after a motion on notice to the parties that the [School] District has met the requirements for disengagement from Court supervision ... at an earlier date." The Decree was signed on May 1, 1997, and thus, by its own terms, the Court retained jurisdiction over the action only until May 1, 2000, when it expired by its own terms.

Significantly, neither party moved to extend the decree. *See E.E.O.C. v. Local 40,* 76 F.3d at 81 (recognizing that where a consent decree expires under its own terms and no party moves for an extension, the decree may continue to be enforced). Indeed, from 1997 to 2000, the parties appeared before the Court on only one occasion, for a status conference in April, 1998.

Moreover, despite the fact that the plaintiffs now contend that the District has been out of compliance with the 1997 Decree since almost the day it was signed (See Joint Declaration of Jonathan Feldman and Bryan Hetherington in Response to Order to Show cause dated April 19, 2001 at ¶ 20), plaintiffs made no motions over the three-year course of the 1997 Decree to enforce the Decree or compel compliance with its provisions. The 1997 Decree clearly provided that "[a]t any time prior to disengagement, plaintiffs may bring a motion to enforce the provisions of this consent Decree if the District fails significantly to carry out any of its obligations under the Decree and has no adequate plan to correct the violation(s) of the Decree within a reasonable period of time." Consent Decree at p. 40, ¶ 2. Plaintiffs were familiar with this remedy as they had on at least two previous occasions prior to 1997 moved to compel compliance with previous Consent Decrees. Nevertheless, plaintiffs made no such motion

during the three-year period of the 1997 Consent Decree.

Additionally, it is apparent that by April 2001, if not earlier, plaintiffs were aware that the Consent Decree had expired. At that time plaintiffs sought a stipulation from the School District, consenting to continuing jurisdiction over this case by the Court. The School District refused to consent to continuing jurisdiction.

The conclusion that the 1997 Consent Decree expired on May 1, 2000 is not altered by the fact that the Decree contemplated that certain acts could occur after May 1, 2000. Such a clause does not render the explicit termination date ambiguous. *See E.E.O.C. v. Local 40,* 76 F.3d at 81 (holding that a consent decree provision providing for the expiration of the decree on a date certain was not rendered ambiguous by a competing clause which provided for a "permanent" injunction, on grounds that the term "permanent" as used in the Decree simply referred to post-litigation activities). In this case, the Decree makes reference to some tasks that are to be completed after the expiration of the 1997 Decree. For example, the Decree requires an inclusion committee to establish a date no later than the 2001–2002 school year by which a majority of special education students would be educated in inclusive environments. 1997 Consent Decree at page 22, ¶ 7. Such a requirement, however, does not nullify the three-year limitation period of the Decree because under the terms of the Decree, the committee must act within the three year period, even if it sets a date for ultimate compliance outside the three-year life of the 1997 Decree.

Because the 1997 Consent Decree expired by its own terms on May 1, 2000, and because there was no request for an extension of the decree by any party prior to its expiration, I find that the Decree is terminated under its own terms, that the case is now closed, and that this Court no longer has jurisdiction to here any claims arising out of the Complaint or the consent decrees.

### III. *Plaintiffs' Objections to Termination of the Consent Decree are without merit.*

■ Plaintiffs cite three main objections to termination of the Decree. First, plaintiffs contend that the School District is out of compliance with the 1997 Decree, and thus the Court should maintain supervision over the Decree and the District. Second, the plaintiffs contend that the District is not in compliance with State and Federal regulations governing special education, and that if this case were terminated, plaintiffs would have no other option but to commence a new action. Finally, plaintiffs contend that the School District's proposal for self-monitoring is a "sham" in light of the fact that the District has not, even under court supervision, been capable of monitoring its progress with respect to meeting the terms of the Consent Decree. Because the Consent Decree has expired, plaintiffs' objections are without merit.

### A. *Alleged Non–Compliance with the 1997 Decree*

Plaintiffs' contention that the District is not in compliance with the dictates of the 1997 Decree is an argument that should have been made to the Court during the time the Decree was in force. To enforce a decree against any party after the decree has expired violates the unambiguous language of the decree as well as the intent of the parties, who negotiated the termination date in good faith. *See E.E.O.C. v. Local 40,* 76 F.3d at 81 (holding that an attempt to enforce a consent decree after its expiration would deprive one of the parties of the benefit of its bargain). Because the plaintiffs never moved to enforce

the Decree, and after April 1998, never reported any violations of the Decree to the Court, I find that plaintiffs current claims that the District is not in compliance with the expired Decree to be untimely.

### B. Alleged Non–Compliance with State and Federal law.

■ Plaintiffs contend that the District is not in compliance with State and federal law with respect to providing special education services to special needs students, there is no evidence in the record to support a finding one way or the other with respect to that issue. Moreover, even assuming that the District had been in violation of any laws or regulations, the parties agreed to settle claims related to those violations by entering into the various consent decrees that have existed throughout 17 of the first 19 years of this litigation. Thus the Consent Decree resolved plaintiffs' claims with respect to any state or federal violations. As part of that resolution the plaintiffs agreed that defendants would remedy alleged violations, and that the Court would maintain jurisdiction over the defendants until May 1, 2000 to ensure that the School District lived up to its obligations under the Decree. But the parties also agreed that while the Decree was in force, the plaintiffs could move this Court to compel compliance with the Decree. Plaintiffs, however, never made such a motion to enforce the 1997 Consent Decree prior to its expiration on May 1, 2000.

### C. The District's Self Monitoring Plan

Plaintiffs contend that the District's proposed self monitoring plan is a "sham," and will not ensure future compliance with federal and state laws regarding the education of disabled children. This objection is speculative and conclusory, and is inapposite to the issue of whether or not the Court should retain jurisdiction over the parties given that the Consent Decree has expired. Accordingly, I find this objection to be without merit.

### IV. The School District is in Compliance with the goals of the Plaintiffs as set forth in their Complaint.

■ Although the expiration of the 1997 Consent Decree, standing alone, is sufficient to justify termination of this case and court supervision of the Rochester City School District, I note that the School District has dramatically improved the way it provides special education programs to students in its schools, and is in substantial compliance with the goals set forth by the plaintiffs in their 1981 Complaint.

As set forth previously, the original Complaint in 1981 alleged that the School District was: (1) failing to timely evaluate students for determination of whether or not they suffered disabilities; (2) failing to notify parents of proceedings effecting their children, failing to allow meaningful parental participation, and failing to notify parents of their substantive and procedural rights; (3) failing to place students in appropriate programs, failing to minimize disruption in placing students, and failing to place students in an appropriate program in a timely manner; (4) failing to provide programs that would educate special needs children in the least restrictive environment; (5) discriminating against disabled students by not allowing them to participate fully in extra-curricular or non-academic programs; and (6) failing to monitor student progress. The School District has addressed each of these concerns over the last 20 years, with significant progress being made in the last few years.

### A. Timely evaluations

The plaintiffs alleged in the 1981 Complaint that students often went for months

without being evaluated after they were referred to the Committee on the Handicapped (now the Committee on Special Education or "CSE") for determination of whether or not those students were disabled. Since then, the District has taken steps to ensure more timely evaluations for the majority of students who are referred to the CSE.. For example, the District has expanded the number of CSE committees from one in 1981, to seven in academic year 1999–2000. *See* April 5, 2001 Affidavit of Marie Cianca at ¶ 25. ("Cianca Affidavit"). As a result, 86.65 percent of school-age children, and 67.22 percent of all preschool children were evaluated within 30 days of a request for evaluation during that school year. *See* Exhibit 2 to the Cianca Affidavit at p. 3. Additionally, once the evaluations were performed, notices were sent or ready to be sent to parents within 10 days in 92.1 percent of all cases for the 1999–2000 school year. *Id.* at p. 4. These figures demonstrate that in the vast majority of cases, Rochester City School District Students are being evaluated in a timely manner once they are referred to the CSE, and parents are receiving timely notice of CSE recommendations.

### B. *Parental Participation*

The 1981 Complaint alleged that parents were discouraged from participating in the process of determining whether or not their children needed special education, and which programs, if any, were appropriate. As noted above, the District now has in place a system for notifying parents of proceedings affecting their child, and informing parents of decisions that have been made affecting their children. Additionally, the School District, through a consultant hired locally through the Advocacy Center, conducts parent workshops at which parents of special education students are trained, and shown how to actively participate in their child's education

and the development of the Individualized Educational Program. The District has also produced and aired on local public television educational videos designed to inform the public about inclusion of special needs students in general classrooms. Surveys of parents with children in special education programs reveal that most parents are satisfied with the treatment both they and their children have received. *See* September 2001 Annual Report to District Court.

These initiatives demonstrate that unlike years past when the District allegedly sabotaged meaningful parental participation, the District is now not only soliciting and welcoming such participation, but is also informing parents on how they can better participate in and advocate for their child's education.

### C. *Placement of Students in Special Education Programs*

The Complaint filed in 1981 alleged that once students were evaluated and it was determined that special education programs would be appropriate, months could pass before students were placed in new programs. The District has successfully remedied that problem, and is now placing over 90 percent of its special education students in their new programs within 30 days. In academic year 1999–2000, 92.4 percent of special education students were placed in programs within 30 days, and 97.5 percent were placed within 40 days. *See* Exhibit 2 to the Cianca Affidavit at p. 6. Moreover, parents were timely notified of the placements—with 99.1 percent of placement letters being mailed or made ready for mailing within 20 days of the CSE evaluation meeting. *Id.* at 5.

Additionally, students are being timely placed in appropriate programs, even in cases where the appropriate program is placement in an out-of-district program.

In academic year 1999–2000, 91.3 percent of students placed in out-of-district programs were placed within 5 days of a space becoming available in that program. *Id.* at 7.

These statistics demonstrate that the School District has implemented procedures for placing students in their new programs in a timely fashion, one of the main concerns of the 1981 Complaint and subsequent consent decrees.

### D. *Education in the Least Restrictive Environment*

The City School District has made significant gains during the last three years in terms of including special education students in general education classes. In the 1998–99 school year, only 32.8 percent of elementary special education students participated in general education classes. Today, 73.9 percent of such students participate in the general curriculum. The gain in middle school participation has been even greater. In 1998–99, only 12.1 percent of special education students participated in general education classes. Now, 60.5 percent of special education students participate in the general curriculum. In high schools, 53.6 percent of special education students now participate in the general curriculum, whereas only 14.5 percent participated in 1998–99. *See* Defendants' November 20, 2001 Memorandum in Support of Order to Show Cause at p. 8.

### E. *Inclusion of Special Education Students in Extracurricular Activities*

Although the School District has not provided statistics with respect to actual participation by special education students in extracurricular activities, the District has reported the results of a survey sent to principals of all schools, which indicates that in most circumstances, at the elementary and middle school levels, more than two-thirds of children in special education programs participate in extracurricular activities. At the high school level, participation has been less, but the District and schools are working on plans to increase participation.

### F. *Monitoring Student Progress.*

The 1981 Complaint alleged that many students were not being evaluated to determine whether or not they were making any progress in their special education programs. The 2001 Annual Report submitted by the School District suggests that the District is now completing virtually all of its projected annual and triennial evaluations. For example, of the 2046 triennial reviews projected for completion in the 2000–2001 school year, 2097 were actually completed. *See* 2001 Report to the Court. According to the District, more reviews were performed than projected because some reviews could have been scheduled but not completed in the previous academic year. Similarly, whereas 6822 annual reviews were projected for the 2000–2001 school year, 6873 were actually completed. *Id.* These figures suggest that Rochester School District students are being regularly monitored to determine whether or not they are advancing within their special education programs.

### G. *Additional Initiatives*

While the School District has shown ample evidence of wholesale, system-wide reform in the way its provides special education services to special needs students, it has also demonstrated that it has reformed its practices at perhaps the most important level: the classroom. Administrative reforms amount to very little if special needs students are not receiving quality instruction in the classroom. To that end, the District has taken great strides to ensure that classroom teachers are trained to understand the needs of special education students in their classrooms, and are able

to provide appropriate care and attention to those students. One of the major components of teacher training has been the mentoring program introduced by the District in which experienced teachers mentor newer teachers, assisting them in meeting the challenges of, among other things, teaching special education students in inclusive settings. Additionally, the District makes special education training available to all teachers, conducting programs that inform teachers of current regulations regarding special education teaching, how to use assistive technology in the classroom, language therapy, and other topics specific to educating special needs students. Many of these training programs are provided by the Special Education Training and Resource Center, which has the mission of providing special education training to all teachers in the District. The District's training programs, along with the mentoring program, are designed to ensure that once special education children are placed in an appropriate program, they will be educated by teachers who understand their needs, and who have been given the tools to effectively educate special needs students.

The programs and initiatives described above demonstrate that the District has in place a well-conceived and implemented plan for providing services to special education students and their parents. The plan comports with the original intent of this lawsuit: to ensure that the School District provides special education students with a fair opportunity to gain a free, appropriately tailored public education in the least restrictive environment possible. Because these programs are in place, and special education instruction is now integrated into the culture of education, rather than being viewed as a separate, additional burden on the School System, the Consent Decree no longer serves the purpose it did when special education curricula were poorly regulated, poorly funded, stop-gap programs given insufficient thought or attention. The programs in place now bear little resemblance to those few programs that existed in 1981, the lack of which prompted the allegations that the School Districts' neglect of special education rose to the level of a Constitutional violation. Today, it would be difficult to allege, no less establish, that the School Districts' efforts to teach its special education students violate the Constitution. Because "[f]ederal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation ..." *Milliken v. Bradley*, 433 U.S. 267, 282, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), continued oversight of the School District would be inappropriate where the District is providing suitable, even if not perfect, special education services.

The plaintiffs contend that there is evidence of continued Constitutional and statutory violations in the form of devastatingly poor results on standardized tests taken by special education students in the Rochester City Schools. However, as the New York State Supreme Court, Appellate Division, Fourth Department, recently noted, "academic failure as measured by performance on standardized tests does not, standing alone, establish a constitutional violation." *Paynter v. State*, 290 A.D.2d 95, 735 N.Y.S.2d 337, 2001 WL 1636325, *4 (N.Y.A.D. 4th Dept., December 21, 2001). As the *Paynter* Court noted, [t]here are myriad reasons for academic failure ...." Clearly, there is room for significant improvement in the test scores of all students in the Rochester City School District. However, where the District is providing adequate services to special education students and their parents, and is doing so in a timely manner, poor test scores will not substantiate a claim for a violation of the Constitution.

## V. *The Future of Special Education in the Rochester School District*

Plaintiffs voice a legitimate concern that if the Consent Decree is lifted, the School District will de-emphasize special education, and that the School District will return to a state in which special education students are not provided with an adequate education. Plaintiffs are particularly concerned that given the stiff competition for resources within a School District that currently faces a significant budget deficit, special education initiatives will be subordinated to cost-cutting measures, and thus special education students will suffer. They argue that without court oversight, students will be left without legal advocates to protect their right to an appropriate education.

While the School District's current budget problems do raise a concern that *all* children in the District will be left with fewer educational resources, special education students are somewhat insulated from many of the problems associated with the current budget deficit in that many of the programs designed to deliver services to students in a timely manner— while allowing for parental participation— are already in place. Indeed, as stated above, the District has, over the years that the Consent Decree has been in place, and particularly over the last three years, implemented district-wide changes that have emphasized the importance of special education, including training teachers to be more adept at handling the needs of special education students in their classrooms, and involving parents in the evaluation and placement stages of the special education process. In short, the system through which children are provided special education services has radically changed since the early 1980's, when services were provided without proper evaluation, coordination, or oversight, to the present where the procedures for evaluat-ing, placing, and monitoring students has become institutionalized. The School District now has in place a plan for evaluating students in a timely manner; notifying parents about the special education process, including their role and rights in the process; seeking and accommodating parental involvement; placing students in the least restrictive environment possible; including special education students in academic and extracurricular activities; and monitoring the progress of students and the District as a whole. This plan ensures that special education students will be treated in a constitutionally appropriate manner, and in accordance with State and federal law and regulations.

Moreover, nothing in this order prevents a special education student or potential student from utilizing the services of a legal advocate should that student feel that he or she is not receiving appropriate treatment. This Order merely discontinues the School District's obligation to pay the fees of the attorneys for the plaintiff class in connection with their monitoring the School District's compliance with the decree, and their individual advocacy on behalf of class members. With respect to monitoring, the dissolution of the 1997 Decree should not have a significant effect given that plaintiffs did not report any violations of the decree to the Court after May 1998, nor did they seek any extension of the Decree from this Court during the period it was in effect.

Finally, State oversight of special education has increased significantly since the original Complaint was filed in 1981. That oversight continues, supplanting this Court's oversight, and provides incentive for the District to remain in compliance with State and federal law with respect to its providing services to special education students.

Ultimately, oversight and responsibility for the education of a special needs student rests with the parent or guardian of that child. There is no substitute for the care and guidance supplied by a parent or guardian at home, where a child spends the majority of his or her day. The District has developed programs to more successfully educate special education students, but without parental involvement, management, and oversight, no program can achieve its full potential. Acknowledging that parental involvement is key to the success of a child's educational program, the District has instituted programs to help parents better respond to the special needs of their children, and to advocate more effectively on behalf of their children. These are welcome initiatives which recognize that without the support and commitment of parents and guardians, as well as teachers, no education program is complete.

## *CONCLUSION*

For the above stated reasons, I hold that the 1997 Consent Decree has expired by its own terms, and that accordingly, this Court lacks jurisdiction over the expired Decree. The case is dismissed with prejudice.

ALL OF THE ABOVE IS SO ORDERED.